Filed 1/30/25  Armstrong v. Gordon CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| CHARLES ARMSTRONG,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TAURA GORDON,<br><br>    Defendant and Appellant. | C097489<br><br>(Super. Ct. No. STK-CV-UBC-2022-0002485) |

Defendant Taura Gordon appeals from a default judgment against her.  Gordon breached an agreement she made with plaintiff Charles Armstrong to participate together in purchasing and breeding a French Bulldog and selling the puppies.  The trial court denied Gordon's motion for relief from default, and it awarded damages in the form of lost profits and prejudgment interest to Armstrong.

Gordon contends the trial court (1) abused its discretion by denying her motion for relief from default since she established excusable neglect and unethical conduct by

Armstrong's attorney; (2) erred in awarding lost profits because evidence of the loss was speculative, and the amount of the award was excessive; and (3) abused its discretion by awarding prejudgment interest.

Except to modify the award of damages and prejudgment interest, we affirm.

FACTS AND HISTORY OF THE PROCEEDINGS

Armstrong and Gordon orally agreed to purchase a French Bulldog for breeding purposes in October 2021. The parties agreed to split the purchase price, ongoing veterinary costs, and certain breeding expenses evenly. The dog would live with Gordon until ready to breed, and then Gordon would deliver the dog to Armstrong for the breeding. If the breeding was successful, Armstrong would sell the puppies, and the two parties would split any profits evenly. Armstrong would return the dog to Gordon. This process would repeat for subsequent pregnancies.

Armstrong purchased a purebred French Bulldog puppy from Top of the Line Frenchies LLC (Top of the Line). He and Gordon each paid Top of the Line $10,000. The puppy, a "blue tan copy fluffy" female, was actually worth $35,000. But Top of the Line agreed to reduce the price to $20,000 due to its relationship with Armstrong. Gordon picked up the puppy and took it to Las Vegas, Nevada, where she lived.

Armstrong registered the puppy with the American Kennel Club (AKC) under the name "Picardy." However, Gordon always referred to the puppy by the name "Royal" in communications with Armstrong.

Within two months of Gordon picking up Picardy, the tone, content, and consistency of Gordon's communications with Armstrong changed. Gordon told Armstrong by text message that Picardy had a hernia which could prevent breeding. She said she would not have spent $10,000 on a dog if she had known the dog could not breed. Armstrong offered to buy out Gordon's interest in Picardy, but she did not accept the offer.

2

Days later, Gordon told Armstrong by text message that the two of them could not do business together, and she was going to refund his payment for the dog so they would not own her together. Gordon said she loved the dog, and the dog had become part of her family. In another text message the following day, Gordon stated she was not sending the dog back because she loved her, "so we just won't bred [sic] her." Armstrong had not agreed to any modification of the parties' ownership agreement. From that point, Gordon refused to communicate with Armstrong despite his numerous attempts to call and text message her to discuss Picardy and resolve the dispute.

Armstrong subsequently learned that Gordon was attempting to register Picardy with the AKC in the name of "Royal." Armstrong's attorney, Kevin Rooney, sent a cease-and-desist letter to Gordon by e-mail and certified mail. Ten days after sending the cease-and-desist letter, Rooney called Gordon and left a message for her to return his call to discuss issues with Armstrong. He also sent a text message to Gordon's cell phone with images of the cease-and-desist letter. Gordon did not respond to any of the messages.

Armstrong filed this action on April 6, 2022. He alleged five causes of action: fraud, breach of contract, breach of fiduciary duty, conversion, and injunctive relief. He alleged Gordon breached the agreement and committed fraud by, among other things, breaking contact with him, submitting false paperwork to the AKC to register Picardy fraudulently, and entering into an agreement with a Nevada breeder to breed Picardy. Armstrong sought damages "in an amount to be proven at trial but not less than $300,000, plus interest."

Rooney e-mailed Gordon a courtesy copy of the complaint. He stated she would be personally served soon. He invited her or her attorney to contact him. She did not respond. Gordon was personally served with the summons and complaint on April 25, 2022.

3

Upon learning Gordon had been served, Rooney e-mailed her. He asked her to advise him whether she had retained an attorney or would represent herself. He also asked her to contact him as soon as possible if she was interested in resolving the matter, as time was of the essence. Otherwise, he would await her answer to the complaint. Gordon did not respond.

Gordon's response to the complaint was due May 25, 2022. Armstrong received no responsive pleading. The following day, May 26, the trial court entered Gordon's default at Armstrong's request. There is no evidence Armstrong notified Gordon of his intention to have her default entered before he requested it. Armstrong subsequently requested entry of court judgment, and a prove-up hearing was set.

On July 21, 2022, Gordon filed a motion to set aside the default due to her mistake, inadvertence, surprise, or excusable neglect. (Code Civ. Proc., § 473, subd. (b) [statutory section citations that follow are to the Code of Civil Procedure].) The trial court ultimately denied the motion because Gordon and her evidence were not credible. We discuss the parties' evidence and arguments on this motion below.

Following a prove-up hearing, the trial court awarded Armstrong $300,000 in damages in the form of lost profits plus $15,159.82 in prejudgment interest and costs. We discuss Armstrong's evidence in support of the damage award below.

DISCUSSION

I

*Motion to Set Aside Default*

A trial court has discretion to set aside a default entered due to a defendant's mistake, inadvertence, surprise, or excusable neglect. (§ 473, subd. (b).) A defendant must request the relief within a reasonable time not exceeding six months from the entry of default. (§ 473, subd. (b).)

4

Gordon contends the trial court abused its discretion when it denied her motion to set aside her default. She claims she moved promptly to set aside the default, and she provided sufficient evidence of mistake, inadvertence, and emotional disability to justify her not timely filing an answer. She also argues that Rooney, Armstrong's attorney, violated his ethical duties by obtaining the default on the first day possible without notifying her of his intention. She claims these factors, considered together, obligated the court to grant her motion to set aside her default.

A.      Background

Gordon filed her motion to set aside her default 56 days after default had been entered. In support of her motion, she declared she had engaged in numerous conversations with Armstrong, and she inadvertently and mistakenly believed her answer was due at a case management conference set for October 7, 2022. She is a real estate agent, often working 50-60 hours per week. As a result, she had little or no time to hire or discuss the case with counsel in California, which she intended to do.

Armstrong opposed Gordon's motion. He denied having any communications with Gordon since Rooney sent her the cease-and-desist letter. Gordon had blocked him on social media, and she had deleted an Instagram account she had used to post pictures of Picardy.

Armstrong argued that Gordon had not been inadvertently or excusably neglectful. Gordon had asserted she had not had time to address the complaint, but photographs posted to her social media accounts since she was served documented a trip she took to Boston in May 2022 and other social gatherings she attended.

Gordon had also attempted to fraudulently register Picardy with the AKC under the name of "Royal." Responding to an AKC inquiry about that matter, Gordon stated in a letter postmarked May 23, 2022—two days before her answer was due—that the dog she registered with the AKC is named "Royal Dior," a dog gifted to her by Marvin

5

Humphrey. The dog the AKC was inquiring about was Royal Dior, "not Picardy." She was "unsure of who Picardy is." The phone number Gordon included under her name was the same number Rooney had called and sent text messages to when he had tried to contact her.

Moreover, Gordon had intended to lie about the dog. Before the action was filed, Gordon showed Rooney's cease-and-desist letter to a personal acquaintance, Terrell Lancaster. She told Lancaster, " 'My silence is killing them. They don't know what to do.' " When Lancaster told her not to ignore the cease-and-desist letter, Gordon said, " 'I'm just going to tell them the dog died and that I got this dog somewhere else. I'm not going to give this dog back. I've had this dog for six months. I'll tell AKC the dog died.' " Gordon also told Lancaster that he "should not be involved if it goes to court" unless he receives a subpoena.

The trial court issued a tentative ruling denying Gordon's motion to set aside the default. But at a hearing the following day, Gordon requested additional time to obtain counsel. She also stated that the dog which was the subject of the lawsuit died in February 2022, and its remains were placed in a garbage receptacle. Gordon currently owned two dogs of the same breed as the dead dog; their names were "Cocoa" and "Royal Dior." The trial court granted a continuance, but it ordered Gordon not to breed, sell, or dispose of the dog that is the subject of the action if the dog still existed. Gordon confirmed she understood the court's order and that the order was a condition of her continuance.

Gordon retained counsel, and through counsel she filed a supplemental memorandum in support of her motion to set aside the default. She argued for the first time that her neglect was excusable because she has mental disabilities which may have impaired her ability to respond to the case's deadlines. Gordon introduced the declaration of Emma Bartlett, a licensed marriage and family therapist. Bartlett stated that Gordon has been diagnosed with bi-polar disorder and with post-traumatic stress disorder

6

resulting from trauma associated with being a victim of domestic violence. In Bartlett's opinion, Gordon's "emotional disabilities may have significantly impaired her ability to understand[] and respond to the deadlines involved in this case." Bartlett stated the pressure of having an attorney call Gordon and the threat of a lawsuit "could trigger the symptoms of her PTSD diagnosis in [a] way that may have affected her memory and ability to respond to situations appropriately, including her ability to respond timely to the summons in this case."

Gordon also argued in her supplemental memorandum for the first time that the trial court could consider the fact that Rooney took her default the day after her answer was due, and he did not give her prior notice of his intent.

Following a hearing, the trial court denied Gordon's motion to set aside her default. During the hearing, and despite Gordon's earlier statements to the contrary and the trial court's prior order, Gordon's attorney confirmed that "the dog is alive and has produced one litter of puppies." Gordon admitted that the dog had successfully bred a litter of five puppies. The court found that from its interactions with Gordon and her concealment of the dog, Gordon and her health assertions were not credible. Her health condition did not satisfy the criteria for relief under section 473.

B.    Analysis

Generally, we may not disturb a ruling on a motion for discretionary relief under section 473 " 'absent a clear showing of abuse.' " (*Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 257.) " ' "[T]hose affidavits favoring the contention of the prevailing party establish not only the facts stated therein but also all facts which reasonably may be inferred therefrom, and where there is a substantial conflict in the facts stated, a determination of the controverted facts by the trial court will not be disturbed." ' " (*Id*. at pp. 257-258.)

7

However, a trial court order denying relief from a default "is scrutinized more carefully than an order permitting trial on the merits." (*Elston v. City of Turlock* (1985) 38 Cal.3d 227, 233.) Where the trial court denies a motion for relief from default, the strong policy favoring trial on the merits conflicts with the general rule of deference to the trial court's exercise of discretion. (*Id.* at p. 235.) "Unless inexcusable neglect is clear, the policy favoring trial on the merits prevails. [Citation.] Doubts are resolved in favor of the application for relief from default [citation], and reversal of an order denying relief results [citation]. Reversal is particularly appropriate where relieving the default will not seriously prejudice the opposing party." (*Ibid.*)

Contrary to ethical duty and legal policy, Rooney took Gordon's default the day after the answer was due and without giving Gordon notice of his intent. And there is no evidence that setting the default aside would be prejudicial to Armstrong. However, the trial court found no credible evidence of excusable neglect. Under these circumstances, we conclude Gordon's inexcusable neglect is dispositive in favor of the court's ruling.

The record contains no credible evidence showing that Gordon's neglect in filing a response to the complaint was excusable. Gordon gave no reason for believing her answer was due at an October case management conference. Her belief was unreasonable in light of her summons expressly informing her the answer was due 30 days after she was served on April 25, 2022. Gordon asserted her press of business kept her from finding California counsel. But press of business is not evidence of excusable neglect. (*Bellm v. Bellia* (1984) 150 Cal.App.3d 1036, 1038.)

Because we must accept Armstrong's facts as true where they conflict with Gordon's, the trial court implicitly found that Gordon refused to have conversations with Armstrong or his attorney. Both men attempted to contact her numerous times to resolve the matter, and Rooney attempted to contact her to open communication for possible settlement or to learn how she intended to proceed in the action. She thwarted all attempts and forms of communication with her.

8

Gordon's evidence of suffering a psychological disability also was not sufficient to establish mistake or excusable neglect. For excusable neglect to result from injuries and disability, the evidence must show that these conditions "substantially interfered with [her] ability to function in daily life, take care of [her] personal and business affairs, or seek out legal counsel." (*People ex rel. Dept. of Transportation v. Superior Court* (*Isenhower*) (2003) 105 Cal.App.4th 39, 43, 46 [showing of excusable neglect for filing a late government tort claim is same for seeking relief under section 473].)

Gordon's evidence did not establish that her disability substantially interfered with her ability to function in daily life. Bartlett, Gordon's therapist, established that Gordon had psychological disabilities, but she stated only that the disabilities "may" have affected Gordon's ability to respond to the complaint in a timely manner. There is no evidence they substantially interfered with her ability to do so. The evidence shows that despite her disabilities, she was able to maintain a busy work schedule, and after being served she was able to take a trip to Boston, attend social gatherings, and write and forward a letter to the AKC two days before her answer was due falsely stating the dog which the AKC was inquiring about was not Picardy and that she did not know who Picardy was. Gordon was able to function in her daily life.

Then there is Gordon's credibility. Gordon told Lancaster she would falsely state that Picardy had died so she could keep the dog. She also had the presence of mind to recognize the inculpatory nature of her statement and thus told Lancaster not to be involved if this matter went to court unless he was subpoenaed. She followed through with her plan, as she falsely told the AKC she did not know of a dog named Picardy and, more significantly, falsely told the trial court the dog had died. From all the above evidence, the trial court found Gordon and her assertions of psychological disability not to be credible.

A court's determination of the cause of default "is in part a credibility determination." (*Cowan v. Krayzman* (2011) 196 Cal.App.4th 907, 915.) "Credibility is

9

an issue for the fact finder. As we have repeatedly stated, we do not reweigh evidence or reassess the credibility of witnesses. [Citation.] ' "We have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom." [Citations.]' [Citation.] When, as here, 'the evidence gives rise to conflicting reasonable inferences, one of which supports the findings of the trial court, the trial court's finding is conclusive on appeal.' " (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622-623.)

The trial court's finding that Gordon was not credible is supported by the evidence, and thus the finding is conclusive. As a result of the court's finding and the other evidence it considered, there is no credible evidence supporting Gordon's contention that she did not timely file a response to the complaint due to inadvertence, mistake, or excusable neglect.

It is true that Rooney with "quiet speed" had Gordon's default entered the day after the answer was due and did not notify Gordon that he would take that action. " 'The quiet speed of plaintiffs' attorney in seeking a default judgment without the knowledge of defendants' counsel is not to be commended.' " (*Lasalle v. Vogel* (2019) 36 Cal.App.5th 127, 135 (*Lasalle*).) "[I]t is now well acknowledged that an attorney has an *ethical* obligation to warn opposing counsel that the attorney is about to take an adversary's default." (*Ibid*.)

Moreover, "to the extent it was possible for a party seeking a default with unseemly haste to commit an *ethical* breach without creating a *legal* issue, that distinction was erased by section 583.130. The ethical obligation to warn opposing counsel of an intent to take a default is now reinforced by a statutory policy that all parties 'cooperate in bringing the action to trial or other disposition.' (§ 583.130.) Quiet speed and unreasonable deadlines do not qualify as 'cooperation' and cannot be accepted by the courts." (*Lasalle, supra*, 36 Cal.App.5th at p. 137.)

Despite this strong language, not every section 473 motion "supported by a colorable declaration" must be granted. "[E]very section 473 motion must be evaluated on its own facts . . . ." (*Lasalle, supra*, 36 Cal.App.5th at p. 140.) And, indeed, *Lasalle* and *Fasuyi v. Permatex, Inc.* (2008) 167 Cal.App.4th 681 (*Fasuyi*), two cases on which Gordon relies, are distinguishable based on their facts. In *Fasuyi*, at the plaintiff's counsel's request, the defendant's legal department gave plaintiff's counsel instructions on how to serve the defendant. After being served, the defendant tendered to insurance, but neither the carrier nor the defendant filed an answer. The plaintiff took defendant's default without notifying defendant and obtained a default judgment. Upon learning of the judgment, the defendant quickly retained counsel, who requested plaintiff's counsel to set the judgment aside voluntarily. Counsel refused. Fifteen days after learning of the judgment, the defendant filed a motion for relief from the judgment under section 473. The trial court denied the motion. (*Id.* at p. 685.)

The Court of Appeal ruled that the trial court abused its discretion by denying the motion for relief. The plaintiff's counsel had not warned the defendant he would take its default, and there was no evidence of inexcusable neglect. The defendant had done all it was reasonably expected to do when a corporation tenders defense to insurance. (*Fasuyi, supra*, 167 Cal.App.4th at p. 694.) "That is the record here. No lack of cooperation from the defense side. Indeed, the converse. No deception. No duplicitousness. No stonewalling. No evasion. And no disregard of any warning. In fact, no warning." (*Id.* at p. 701.) Although there was no warning, there also was no evidence of inexcusable neglect such as there is here.

In *Lasalle*, the plaintiff sued the attorney who had represented her in a dissolution action for malpractice after the defendant repeatedly failed to provide discovery and the trial court defaulted the plaintiff as a terminating sanction. (*Lasalle, supra*, 36 Cal.App.5th at p. 131.) The defendant did not timely file a response. Six days after a response was due, the plaintiff's counsel sent the defendant a letter and an e-mail

threatening to take her default if counsel did not receive a responsive pleading by close of business the next day. When no response arrived, the plaintiff took the defendant's default and e-mailed a copy to the plaintiff. Less than two hours later, the defendant e-mailed a request for an extension, but the default had already been entered. (*Ibid*.)

Four days later, the defendant retained counsel, and a week later, she filed a motion to set aside the default under section 473. (*Lasalle, supra*, 36 Cal.App.5th at p. 131.) She declared that when she received the summons, she was involved in a number of cases. (*Id*. at p. 131, fn. 4.) She was also involved in her own divorce and had just discovered that her husband had failed to pay property taxes and the mortgage on the family residence, and both were in default. She had met with an attorney after being served, but then learned the attorney had a conflict of interest. While searching for a new attorney, she contacted the plaintiff's counsel and asked for a brief extension to respond to the complaint. While she was waiting for a reply, she received the notice of default. She was a single mother, and between taking care of her family and her practice and trying to obtain files from the plaintiff, she failed to timely file her answer. She obtained new counsel as soon as she could. (*Ibid*.)

The trial court denied the motion for relief, but the Court of Appeal reversed. "Several factors combine[d]" to convince the court that the trial court had abused its discretion. (*Lasalle, supra*, 36 Cal.App.5th at p. 137.) In addition to plaintiff's counsel's lack of notice, the court noted the unreliability of using e-mail to communicate, the short deadline given by the plaintiff's counsel, the lack of prejudice to the plaintiff if the default was set aside, the unusual nature of the malpractice claim (the defendant was responsible for losing the plaintiff's entire dissolution case, so the malpractice action would require litigation on multiple items and issues), the defendant had a meritorious defense against part of the action (an incorrect award of nonrecoverable damages for emotional distress), the trial court's improper reliance on propensity evidence, and the

trial court's not considering the defendant's explanation for the lack of a response. (*Id*. at pp. 137-140.)

In neither *Fasuyi* nor *Lasalle* did the Court of Appeal find inexcusable neglect. In both cases, the defendants' neglect had been excusable under the circumstances. The plaintiffs' attorneys in both cases had refused to cooperate with the defendants' reasonable requests for relief. And at no time was either defendant duplicitous or dishonest.

Here, unlike in *Fasuyi* and *Lasalle*, the evidence of inexcusable neglect is clear. Gordon went about her life and career after being served having no justifiable reason for not responding to the complaint. She did not cooperate with Armstrong and Rooney, despite their numerous attempts to initiate settlement discussions and learn her intention for responding to the complaint. She engaged in deception and duplicitousness against the parties and the court by falsely claiming Picardy had died. And the trial court found that she and the evidence of her disability affecting her ability to respond were not credible. Under these unique circumstances, where evidence of excusable neglect and mistake is absent, we cannot say the trial court abused its discretion when it denied Gordon's motion to set aside the default.

We note that Armstrong also argued before the trial court that Gordon's waiting nearly two months from receiving notice of her default until filing her motion to set aside the default was unreasonable under the circumstances and did not establish she acted with diligence. The trial court did not address this issue, and we need not address it here.

II

*Award of Lost Profits*

Lost profits may be recoverable as damages for breach of a contract " 'where the evidence makes reasonably certain their occurrence and extent.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773-774 (*Sargon*

13

*Enterprises*).) To prove damages in a default judgment proceeding, a plaintiff need merely establish a prima facie case. (*Johnson v. Stanhiser* (1999) 72 Cal.App.4th 357, 361-362.)

Gordon contends the judgment must be reversed because the lost profit damages of $300,000 were excessive, unsupported by the evidence, and speculative. She asserts the only damage award supported by the evidence would be one for $10,000, the amount Armstrong paid for his share of the dog.

A.    Background

Montrell Henderson is the owner of a dog breeding business called Frontline Frenchies 510. He has been in the dog-breeding business for approximately 25 years. Over seven years, he has bred approximately 80 French Bulldogs, 70 of which were sold. At the prove-up hearing, the trial court declared Henderson to be an expert in the French Bulldog breeding industry to offer an opinion as to value.

Henderson stated that dogs bred by breeders such as him and Top of the Line command higher prices because of their uniqueness and the quality of their parentage. As a result, Picardy, who was the product of two Top of the Line dogs, could have been sold for significantly more than $20,000. The price Top of the Line would have charged for Picardy, $35,000, was within the reasonable range for a female like her.

Henderson stated that Picardy's sire, or father, is Grizzly. Grizzly carries a rare combination of hereditary traits, and that combination has made him one of the most sought after studs in the business. Picardy's dam, or mother, is Miss Cali. Miss Cali's father, Don Blue, was at one point the most sought after micro-French Bulldog stud in the United States.

Based on his knowledge and experience, Henderson estimated that Picardy would be able to breed three or four times in her lifetime. If she were bred with high-quality French Bulldogs such as those owned by Frontline Frenchies and Top of the Line, it was

14

reasonable to expect that each litter would return at least $150,000 and as much as $500,000 or more. If she were bred with males of lesser parentage, the market price for her offspring would be far lower. Also, if Picardy did not receive proper veterinary care during and between her pregnancies, she and her litters could suffer health problems and even premature death.

Armstrong testified at the prove-up hearing that he entered the dog breeding business in February 2021, approximately eight months before he entered into the agreement with Gordon. He had purchased six dogs from Top of the Line before he purchased Picardy. The trial court designated Armstrong as an expert regarding value.

Asked why someone would pay $20,000 for a dog, Armstrong said, "[I]t's just simple entrepreneurship," and he gave examples: "[I]f you purchase a dog for 20,000, that means a dog is worth at least 20,000. And if she has five puppies, you can probably sell those pups for 20,000 or more or less depending on the stud that you use in the mating. [¶] . . . So if I use a top stud and she has five pups, my 20,000 can turn into 100,000, minus the stud fee, minus the vet fees, and minus the whelping [birthing] fees. [¶] . . . If you spend, let's say, $25,000 and you make 100,000 minus the vet bills and everything, you should probably profit 65,000 on one dog."

Armstrong stated that most French Bulldogs are mature enough for breeding by 16 to 18 months old and can safely deliver three or four litters during their life. In his experience, the average litter for a French Bulldog is five to eight puppies.

Armstrong selected Picardy because she has a number of genetic traits that make her offspring more desirable and therefore more profitable. She has unique "blue" and "tan" coloring from her mother and carries the "fluffy" gene from her father. She also carries the recessive "Isabella" coloring gene from her father.

Armstrong planned on breeding Picardy to another French Bulldog owned by Top of the Line named Pinkie, who has rare pink coloring and also carries the fluffy gene. Based on the genetic make-up of Picardy and Pinkie, Armstrong expected at least two of

15

their pups in a litter would appear fluffy.  Visually fluffy French Bulldogs are more valuable.

Armstrong introduced a price list for French Bulldogs he obtained from a United Kingdom breeder's Internet webpage.  Armstrong believed this particular breeder shipped the best studs to America and "pretty much" set the market price.  In Armstrong's opinion, the listed prices showed in dollars what the various types of French Bulldogs could command on the market.

Armstrong also introduced five online advertisements for the sale of visually fluffy French Bulldogs to help establish market price.  A fluffy female with Isabella and tan coloring was priced at $100,000.  Another fluffy female with Isabella coloring was priced at $75,000.  Two fluffy females with lilac and tan coloring were priced at $55,000 and $50,000 respectively.  A fluffy male with lilac and tan coloring was priced at $35,000.

Relying on the introduced evidence, Armstrong stated that $300,000 was a reasonable expectation of the profits he would have received under the contract with Gordon had Gordon not breached it.  He based that value in part on learning Picardy had birthed five pups.  But because Gordon had refused to let him see the pups, send a photo of them, or even speak with him, he had to rely on the price sheet and his knowledge of genetics to determine their reasonable value instead of the pups' actual characteristics.

Because Picardy and Pinkie carried the fluffy gene, at least two of their five puppies would have been visually fluffy.  Because those two pups would also carry the pink gene, Armstrong believed each would sell for $100,000.  The remaining puppies would sell for between $30,000 and $50,000 each, based on Pinkie's genetic make-up.  If any of them inherited the Isabella from Picardy and the fluffy carrier from either parent, this would add $5,000 to $10,000 to their price.

As far as costs, Armstrong would incur stud fees from $5,000 to $20,000, depending on the stud, for each pregnancy.  Whelping and weening fees would range from $5,000 to $10,000.  There was potentially additional income if any of the male pups

could be studded out. A "beautiful" male dog could earn stud fees of $10,000 to $20,000 per inseminated dog. But because Armstrong believed the ultimate loss of profits exceeded $300,000, which was the request in the complaint, he asked for the full $300,000 without quantifying any potential stud revenue he would have earned.

The trial court found that Armstrong had met his prima facie burden of proof, and it awarded him $300,000 in damages plus prejudgment interest and costs.

B.    Analysis

The California Supreme Court in *Sargon Enterprises* explained the law concerning the recovery of prospective profits for breach of contract as follows: "Such damages must 'be proven to be certain both as to their occurrence and their extent, albeit not with "mathematical precision." ' (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 975.) The rule that lost profits must be reasonably certain is a specific application of a more general statutory rule. 'No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin.' (Civ. Code, § 3301; see *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 760.)

"Regarding lost business profits, the cases have generally distinguished between established and unestablished businesses. '[W]here the operation of an established business is prevented or interrupted, as by a . . . breach of contract . . ., damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales.' (*Grupe v. Glick* [(1945)] 26 Cal.2d [680,] 692.) 'Lost profits to an established business may be recovered if their extent and occurrence can be ascertained with reasonable certainty; once their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical

17

precision. [Citations.] Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits. [Citations.] In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions. [Citations.]' (*Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, 161-162.)

" 'On the other hand, where the operation of an unestablished business is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative. [Citations] . . . But although generally objectionable for the reason that their estimation is conjectural and speculative, anticipated profits dependent upon future events are allowed *where their nature and occurrence can be shown by evidence of reasonable reliability*.' (*Grupe v. Glick, supra,* 26 Cal.2d at pp. 692-693.)

" 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. [Citation.] This is especially true where . . . it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits [citation] or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled.' (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873-874 [permitting an award of profits calculated from a project's '*actual* income'].)" (*Sargon Enterprises, supra*, 55 Cal.4th at pp. 774-775, first italics added.) "It is enough to demonstrate a reasonable probability that profits would have been earned except for the defendant's conduct." (*S. C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 536.)

Expert testimony concerning lost profits must be "[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the

18

subject to which his testimony relates . . . ." (Evid. Code, § 801, subd. (b).) This means that the matter on which the expert relies " 'must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible.' " (*Sargon Enterprises, supra*, 55 Cal.4th at p. 770.) The trial court "acts as a gatekeeper to exclude speculative or irrelevant expert opinion." (*Ibid*.)

Generally, we review an award of lost profits for substantial evidence. (*Asahi Kasei Pharma Corp. v. Actelion Ltd.* (2013) 222 Cal.App.4th 945, 969.) The plaintiff bears the burden of producing "the best evidence available in the circumstances to attempt to establish a claim for loss of profits." (*S. C. Anderson, Inc. v. Bank of America, supra*, 24 Cal.App.4th at p. 536.) The lost profits must be " 'the natural and direct consequence of the breach.' " (*Postal Instant Press, Inc. v. Sealy* (1996) 43 Cal.App.4th 1704, 1709.) " 'While lost profits can be established with the aid of expert testimony, economic and financial data, market surveys and analysis, business records of similar enterprises and the like, the underlying requirement for each is " 'a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed.' " ' " (*Sargon Enterprises, supra*, 55 Cal.4th at p. 776.)

Because this appeal arises from a default judgment, however, we review only for substantial evidence of a prima facie case. " 'Generally speaking, the party who makes default thereby confesses the material allegations of the complaint. [Citation.] It is also true that *where a cause of action is stated* in the complaint and evidence is introduced to establish a prima facie case the trial court may not disregard the same, but must hear the evidence offered by the plaintiff and must render judgment in his favor for such sum, not exceeding the amount stated in the complaint, or for such relief, not exceeding that demanded in the complaint, as appears from the evidence to be just. [Citations.]' (*Taliaferro v. Davis* (1963) 216 Cal.App.2d 398, 408-409.) With the correct standard in mind, we look at the evidence to determine whether plaintiff established a prima facie case." (*Johnson v. Stanhiser, supra*, 72 Cal.App.4th at pp. 361-362.)

19

Indeed, our review of evidence to support damages awarded in a default judgment is limited to whether damages are excessive. (*Uva v. Evans* (1978) 83 Cal.App.3d 356, 363.) We may set aside damages awarded in a default judgment only when they are (1) grossly disproportionate to the evidence and appear to be the result of passion, prejudice, or corruption; (2) so out of proportion to the evidence that it shocks this court's conscience; or (3) contrary to law. (*Siry Investment, L.P. v. Farkhondehpour* (2022) 13 Cal.5th 333, 343.)

Substantial evidence supports the trial court's determination that Armstrong established a prima facie case for recovering lost profits. As alleged in the complaint and as established at the trial court and in the settled statement, Gordon breached her agreement with Armstrong by entering into an agreement with a Nevada breeder to have Picardy bred, and Picardy has delivered at least one litter consisting of five puppies. These facts establish the occurrence of lost profits.

As for the extent of the lost profits, Gordon has refused to disclose any details or photographs of the puppies or to share with Armstrong any details or revenue from their possible sale. Because Gordon's wrongful acts have created the difficulty in establishing the amount of any lost profits, the law required Armstrong in establishing a prima facie case by using some reasonable basis to compute damages. (*Sargon Enterprises, supra*, 55 Cal.4th at pp. 774-775.)

Under these circumstances, Armstrong's introduction of expert testimony (by Henderson and himself) regarding the genetics and value of bred French Bulldog puppies based on the experts' experience in breeding and selling French Bulldogs, and Armstrong's reliance on market prices for determining the value of the type of puppies Picardy would have birthed had Gordon not breached the contract, constituted a reasonable basis on which the court could determine a prima facie case for lost profits. The expert testimony was based on experience and an understanding of the market. There was a substantial similarity between the facts forming the basis of the expert's

20

profit projections and the business opportunity that was destroyed. The expert's testimony did not rest simply on guess, surmise, or conjecture, as Gordon contends. Even in cases of unestablished businesses such as the business venture between Armstrong and Gordon, there is no requirement that the plaintiff base its lost profits, for example, on the experience of comparable businesses. (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 399.) Reasonably reliable expert testimony will do.

The evidence established a prima facie case that had Gordon not breached her agreement with Armstrong, Armstrong would have reasonably realized a profit at least on the sale of Picardy's first litter of five puppies. According to Armstrong's expert testimony, had Picardy been bred with Pinky at an appropriate age, as was Armstrong's plan, at least two of her first pups would have been born visually fluffy and would have carried the pink gene. These two puppies would sell for $100,000 each. The remining three puppies would have sold for between $30,000 and $50,000 each based on Pinkie's genetic make-up, and they would have sold for an additional $5,000 to $10,000 if any inherited the Isabella gene from Picardy and the fluffy carrier from either parent. Gross revenue from the first litter of five pups thus would have been from $290,000 to $350,000, and possibly higher. Subtracting from gross revenue the stud fees of $20,000 and whelping and weening frees of $10,000 (the higher estimates) leaves a net profit of $260,000 to $320,000. Armstrong's 50 percent share from the first litter would thus have been from $130,000 to $160,000, less his $10,000 payment to purchase Picardy.

We recognize that these damage amounts are not calculated with absolute certainty. But particularly in the context of a default prove-up hearing where Armstrong was required to establish only a prima facie case of damages and was hindered in doing so by Gordon's actions, we heed our Supreme Court's counsel: "The lost profit inquiry is always speculative to some degree. Inevitably, there will always be an element of uncertainty. Courts must not be too quick to exclude expert evidence as speculative merely because the expert cannot say with absolute certainty what the profits would have

21

been. Courts must not eviscerate the possibility of recovering lost profits by too broadly defining what is too speculative. A reasonable certainty only is required, not absolute certainty." (*Sargon Enterprises, supra*, 55 Cal.4th at p. 775.) Here, Armstrong has established a prima facie case of a reasonable certainly of recovering lost profits at least on Picardy's first litter.

Citing out-of-state authority, Gordon contends that any damages for unborn animals are not recoverable because they are too speculative or uncertain. (*Pagel v. Yates* (1984) 128 Ill.App.3d 897, 904.) Long ago and on analogous issues, this court decided otherwise. In *Hodgkins v. Dunham* (1909) 10 Cal.App. 690 (*Hodgkins*), overruled on another ground in *Gagne v. Bertran* (1954) 43 Cal.2d 481, 488, fn. 5, a panel of this court upheld an award of lost profits in an action for fraud when a stallion that was warranted and purchased for breeding proved to be impotent. The plaintiff bred the horse to 31 of his mares and 32 mares belonging to others. Only one of plaintiff's mares got in foal, and only two of the other mares got in foal, even though most of the mares had produced colts in the past. (*Hodgkins*, at p. 702.) The evidence established that a stallion of sufficient age in good condition as was promised to the plaintiff could safely serve 60 to 75 mares each season, about 60 percent of which should get in foal. About 90 percent of those in foal would successfully deliver. (*Id*. at p. 703.) The trial court found that the plaintiff, who purchased the stallion for $2,500, lost one breeding season to his damage of $1,625 (the stallion died the following year), and it awarded a judgment for $4,125. (*Id.* at pp. 696, 697.)

The defendants contended the evidence of damages was remote and that lost profits were speculative, conjectural, and uncertain. (*Hodgkins, supra*, 10 Cal.App. at p. 711.) The Court of Appeal disagreed, ruling the evidence "left little, if any, uncertainty as to the actual damages sustained." (*Ibid*.) The plaintiff had introduced evidence "of the value of colts, thoroughbred and graded, when foaled; also when weaned at six months;

the value of the breeding season; the money loss in failure of the horse resulting in the failure of the mares to have colts." (*Ibid*.)

Gordon's argument as to the speculative nature of recovering profits on unborn animals, however, carries greater weight regarding any additional litters Picardy may have. Disagreeing with the trial court, we conclude that any evidence of lost profits from additional litters Picardy might birth is too speculative and not reasonably certain. There is too much uncertainty as to the actual damages Armstrong would sustain on additional litters. That Picardy successfully gave birth to one litter of five puppies does not establish to a reasonable certainty that she will successfully give birth to at least two additional litters of five healthy puppies, that she will be bred with Pinky each time, or that either dog would be alive and able to successfully complete the breeding process in the future. The damage award thus must be modified.

Gordon's other arguments against the damage award for lost profits on Picardy's first litter are not persuasive. She claims the trial court erred to the extent it awarded damages for any profits from studding one of Picardy's male pups in the future. But Armstrong expressly informed the court he was not seeking any such damages, as he believed he had established lost profits in excess of the amount claimed in the complaint.

Gordon contends there is no substantial evidence of net profits. Armstrong was not certain about his costs and gave only ranges of costs. And Gordon contends there was no evidence supporting the "hearsay" claim that she had Picardy bred, resulting in five puppies. As for costs, Armstrong intended to breed Picardy with a very valuable sire. Given the values at stake, we believe it is reasonable to assume he would have incurred fees at the higher end of the possible ranges he testified to. As for the "hearsay" claim that Picardy was bred and delivered five pups, we rely on the settled statement the parties prepared and the trial court approved to document the hearings on Gordon's motion for relief from default. The statement declares: "During the September 26, 2022, hearing,

23

Ms. Gordon admitted to the Court that the dog at issue in the case not only was still alive, but had already successfully bred a litter of five puppies."

Finally, Gordon contends the lost profits were unrecoverable as special damages. She claims special damages generally consist of out-of-pocket losses, and there is no evidence Armstrong incurred out-of-pocket losses except for his initial $10,000 investment. Lost profits, however, may be awarded as special damages if they are pleaded with particularity and proven to be reasonably certain as to their occurrence and their extent. (*Sargon Enterprises, supra*, 55 Cal.4th at pp. 773-774; *Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist., supra*, 34 Cal.4th at p. 975.) By definition, lost profits are not limited strictly to out-of-pocket losses.

Where the evidence is sufficient to sustain some, but not all, of a damages award, we may reduce the judgment to the amount supported by the evidence and affirm as modified. (*Russell v. Man* (2020) 58 Cal.App.5th 530, 538.) The evidence supports an award of lost profits in the amount of $120,000, which is the minimum amount of profits to which Armstrong testified, plus $10,000 for Armstrong's initial investment. We will direct the trial court to modify the judgment to award this amount.

III

*Prejudgment Interest*

A trial court has discretion to award prejudgment interest on an unliquidated contract claim. (Civ. Code, § 3287, subd. (b).) It also has discretion to decide the date from which such interest should be awarded but not earlier than the filing of the action. (Civ. Code, § 3287, subd. (b).) The trial court awarded Armstrong $14,218.87 in prejudgment interest. The interest was based on the award of $300,000 in damages.

Gordon contends the trial court abused its discretion by awarding prejudgment interest based on any damages except Armstrong's $10,000 original investment. She claims the court erred because the amount of damages was not known throughout the

24

litigation, the award was not necessary to make Armstrong whole as of the date of the breach, the 10 percent interest rate was significantly higher than the market rates at the time of the action, the loss was not readily ascertainable until the judgment was issued because it was based on lost profits, there was no delay in bringing the matter to trial, and the dispute was not complicated. Further, the trial court did not disclose that it weighed any factors in making its decision.

" 'Prejudgment interest is awarded to compensate a party for the loss of the use of his or her property.' " (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 574 (*Hewlett-Packard*).) It " 'provide[s] just compensation to the injured party for loss of use of the award during the prejudgment period—in other words, to make the plaintiff whole as of the date of the injury.' " (*Ibid*.) We review a trial court's award of prejudgment interest under Civil Code section 3287, subdivision (b) for an abuse of discretion. (*Ibid*.) "We will uphold the trial court's exercise of discretion 'if it is based on a "reasoned judgment" and complies with the " . . . legal principles and policies appropriate to the particular matter at issue." ' " (*Id*. at pp. 574-575.)

Because we are reducing the $300,000 damage award, we must also reduce the award of prejudgment interest. However, we disagree with Gordon's argument that no prejudgment interest should be awarded except based on the $10,000 investment. Picardy delivered one litter of five pups before judgment was entered. The trial court had discretion to award prejudgment interest on expected profits from that litter.

Gordon correctly asserts that the amount in damages was not known and was not readily ascertainable until judgment. But uncertainty in the amount of damages is not alone determinative. (*Hewlett-Packard, supra*, 65 Cal.App.5th at p. 576.) Moreover, the uncertainty resulted in part from Gordon's actions. She untruthfully told the court Picardy had died, and she did not communicate with Armstrong or provide any information about Picardy's puppies. Armstrong incurred damages before judgment, but they could not be calculated until judgment, and the date the damages were incurred

25

could not be determined. Under these circumstances, the trial court did not abuse its discretion by compensating him for his prejudgment loss from the date of filing the action.

Gordon criticizes the trial court for not weighing factors or explaining its reasons for awarding prejudgment interest. But we indulge all intendments and presumptions in support of a trial court's discretionary decision on matters about which the record is silent, and the appellant must affirmatively show error. (See *Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443.) Addressing a trial court's discretion to dismiss an action, the California Supreme Court explained, "Although a lower court is obliged to consider the relevant factors when ruling on a discretionary motion to dismiss, it is not compelled to state in written or oral form its reasons for granting a discretionary dismissal. . . . Thus, even if there is no indication of the trial court's rationale for dismissing an action, the court's decision will be upheld on appeal if reasonable justification for it can be found. 'We uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion." ' " (*Ibid.*) The same holds true with a trial court's discretion to award prejudgment interest.

As explained, Gordon has not shown that the trial court abused its discretion in awarding interest based on profits lost from Picardy's first litter. And despite Gordon's protest, 10 percent per annum is the statutory rate for determining prejudgment interest in contract actions where the contract does not state a rate. (Civ. Code, § 3289, subd. (b).) We will thus include in the modified award of damages a modified award of prejudgment interest. From the date of filing the action, April 6, 2022, to the date judgment was entered, October 11, 2022, is 188 days. Ten percent of $130,000 is $13,000, resulting in a daily interest rate of $35.62, for a total prejudgment interest award over 188 days of $6,696.56.

## DISPOSITION

The trial court is directed to modify the judgment by awarding Armstrong $130,000 in damages plus $6,696.56 in prejudgment interest. In all other respects, the judgment is affirmed. Each party shall bear their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

 

 

                                 _____

                                 HULL, Acting P. J.

We concur:

_____

FEINBERG, J.

_____

WISEMAN, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27